1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

JEFFREY DUPREE JONES,

11

Petitioner,                              No. CIV S-09-CV-1408 WBS CHS P

12

vs.

13

M.S. EVANS,

14

Respondent.              FINDINGS AND RECOMMENDATIONS

15

_____/

16

## 1. INTRODUCTION

17

Petitioner, Jeffrey Dupree Jones, is a state prisoner proceeding pro se with a petition

18

for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a cumulative

19

sentence of thirty years to life with the possibility of parole following his 2007 jury convictions after

20

three separate trials.  First, Petitioner was convicted of being a felon in possession of a firearm

21

(Count Three), with a hung jury as to two counts of attempted murder (Counts One and Two).  A

22

second trial resulted in a mistrial due to a hung jury on the same two counts .  He was convicted in

23

a third trial of the two counts of attempted murder, both with firearm enhancements, and the trial

24

court found true prior conviction allegations.  Here, Petitioner challenges the constitutionality of his

25

convictions.

26

/////

## II. CLAIMS

Petitioner presents several grounds for relief.  Specifically, the claims are as follow, verbatim:

(1)    The trial court abused its discretion and denied [Petitioner] due process of law at both the first and third trials by allowing the people to introduce evidence that [he] was a member of a street gang.

(2)    The trial court abused its discretion and denied [Petitioner] due process of law by limiting cross-examination at the third trial of the complainant in Count 2, thus improperly excluding evidence bearing on Franklin's credibility and denying [Petitioner] his fifth, sixth and fourteenth amendment due process rights to effectively confront and cross-examine his accusers.

(3)    The evidence was insufficient to show an attempt to kill Franklin.

(4)    [Petitioner] was denied a fair trial by the jury's use of a magnifying glass coupled with the court's refusal to reopen the trial.

(5)    The trial court's refusal to allow the jury to view the scene where the incident took place was an abuse of discretion which denied appellant a fair trial.

(Pet. Ex. B).

After careful consideration of the record and the applicable law, it is recommended that each of Petitioner's claims be denied..

## III. BACKGROUND

**A. FACTS**

The basic facts of Petitioner's crimes were summarized in the unpublished opinion of the California Court of Appeal, Third Appellate District, as follows:

> A fight broke out at a bar in Stockton, followed by [a] shooting in the parking lot that killed two people.  Thereafter defendant shot and seriously wounded Dewayne Jackson; he aimed and fired a gun at Ronnie Franklin, but the gun did not discharge . . . .
>
> . . . .

The prosecution theory was that after two men were killed and one injured, defendant became involved in the fight. He took a gun from his injured friend and fellow gang member, shot Jackson and then threatened and attempted to shoot Franklin. The defense version of events was that defendant's friend, Marcus McDaniel, did the shooting.

On the evening of October 22, 2004, Leon Smith, known as Big Man, his roommate Dewayne Jackson, and a friend, Vern, went to Donald's Place, a bar and club in Stockton. There they met their friend, Harold Jones and played pool.

Ronnie Franklin also went to Donald's Place that night. He took his son's mother and her friend; he stayed because they wanted him to pick them up later and he did not want to drive across town.

A fight broke out near the pool table after Troy Latin called Harold Jones a snitch. The fight escalated, many people were involved. The bartender called 911. The group hit and kicked Harold Jones, while he was under the pool table. Defendant knocked a female bartender to the floor and apologized. Smith and Jackson left the club and headed to their car. Franklin also left the club when the fight broke out.

As Smith and Jackson went to their car, five men tried to sucker punch Smith. Jackson told them they were not trying to fight, but just going home. At the car, Smith got a gun and walked back towards the club. Smith went up to the group of men and said "jump me now." One of the men, Terry Gaines, told Smith, "that's what you guys get, you know, you don't belong here anyway." Smith got in Gaines' face and shot and killed him. Smith and Gaines had a problem with each other stemming from a homicide at the Rose Garden apartments.

Franklin was Gaines's [sic] second cousin. Someone ran up to Franklin and told him Gaines had been shot. Telling the women he was with to stay in the car, Franklin ran to Gaines and then called 911.

There were more shots and Smith was killed. Marcus McDaniel was shot in the leg. McDaniel returned to the club, saying he had been shot. Defendant helped him.

Defendant left the club and looked at Smith's body. He saw Jackson and shot him. Jackson was hit in the lower spine and paralyzed. Jackson looked up and defendant was in his face; Jackson looked right in defendant's eyes. Defendant pulled the trigger again, but the gun did not fire. Defendant kicked Jackson and hit him with the gun.

3

Jackson grabbed his cell phone and called his mother.

Franklin saw defendant standing over Jackson with the gun and saw defendant hit and kick Jackson. Defendant looked around and saw Franklin. Franklin told defendant he was not affiliated and did not gang bang. Franklin had been a Blood gang member, but stopped affiliating in 1997 after a robbery conviction. Defendant pointed the gun at Franklin and pulled the trigger. Franklin heard the gun click, but it did not fire. Franklin left and called 911 again. He called the police because Gaines and Jackson were shot; he would not have reported just the assault on himself.

When the police arrived, the scene was chaotic and the crowd was hostile. There were three victims: Gaines, Smith and Jackson. Smith had been shot multiple times. McDaniel had left. No guns were recovered. Based on the bullets found at the scene, a criminalist determined there were nine shots from a nine-millimeter gun and at least three from a .38-caliber gun. He could not say if the .38-caliber bullets were fired from the same gun.

The police collected several surveillance tapes from the club. The tapes showed the fight around the pool table and the various participants in the shooting entering and leaving the club. The tapes showed Gaines with a gun and defendant with a gun, and later smiling. The prosecution later made a reenactment tape, showing its version of the shooting. This tape was played for the jury.

At the hospital, Jackson told the police the shooter was a Black male, 5 foot 10 or 11, 200 pounds, wearing a blue hooded sweatshirt and blue jeans with a blue rag. He initially picked McDaniel's photograph out of a lineup, but told the police the shooter had a thinner face. Jackson told the police the shooter might be in the photograph on the cover of a rap CD. When shown the CD, however, Jackson did not identify anyone.

When McDaniel's picture appeared in the newspaper, identified as the shooter, Jackson called the police and said McDaniel was not the shooter. Jackson had seen the shooter before in a white Ford Explorer. Months before the shooting, the police had stopped defendant in a white Explorer with McDaniel and two other men. Jackson thought a girl he knew had a picture of the shooter in her room. She did not want to get involved so he called the girl's cousin. Through the cousin, Jackson learned the shooter's name was Jeffrey Jones and he went by the name Smooth. Jackson called detectives with this information. When shown pictures of both defendant and McDaniel, Jackson selected defendant as the shooter. Jackson recalled that he had seen defendant sitting with McDaniel at the club before the shooting. He identified defendant in court.

4

The morning after the shooting, Franklin gave police a detailed statement. He described his assailant as dark complected, 5 foot 8 to 10, 170-190 pounds, 23 to 27 years old, with a hat and a blue hooded sweatshirt. Franklin initially identified McDaniel as the shooter in a photographic lineup. Franklin claimed he identified defendant as the shooter when he saw him at Gaines's [sic] funeral. Defendant did not attend the funeral. Franklin did not contact the police after he saw defendant. In fact, he tried to avoid the detective handling the case because he did not want to be involved. When shown DMV photographs of defendant and McDaniel, Franklin pointed to defendant.

Franklin did not respond to a subpoena in an earlier trial. He admitted he had not always told the police the truth; he did not trust them due to bad experiences. He was arrested after his failure to appear and refused to talk unless granted immunity. He admitted he lied both before and after the grant of immunity. Sometimes he just went along with what the police suggested. The defense request to cross-examine Franklin about another shooting was denied.

In his statement to the police, defendant denied he had a gun that night. He had known McDaniel two years and they were good friends. They were both Crips, a gang associated with the color blue.

A number of defense witnesses testified that defendant was inside the club when the shots were fired. One witness testified McDaniel was the shooter.

A defense expert testified to the unreliability of witness identification.

(Lodged Doc. 4 at 1-7).

An information filed on January 7, 2005 charged Petitioner with three counts. Count One charged the attempted murder of Dewayne Jackson, with penalty enhancements for intentional and personal discharge of a firearm and personal infliction of great bodily injury. Petitioner was charged in Count Two with the attempted murder of Ronnie Franklin, as well as a penalty enhancement for personal use of a firearm. Count Three charged Petitioner with being a felon in possession of a firearm. In addition, Petitioner faced penalty enhancements for a prior conviction of a serious felony, a prior prison term, and a prior serious felony as a strike.

There were three separate jury trials. Following the first trial, Petitioner was

5

convicted on Count Three, and he admitted the prior conviction, prison term, and serious felony as to that count.  The jury hung on Counts One and Two, resulting in a mistrial on those counts.  A second trial also resulted in a mistrial on Counts One and Two.  A third trial resulted in Petitioner's convictions on Counts One and Two.  In addition, the trial court found true the additional penalty enhancement allegations as to those two counts.  Petitioner was sentenced to life in prison with the possibility of parole, with the minimum term of fourteen years to be served, plus thirty years to life with the possibility of parole.

Petitioner timely appealed his convictions to the California Court of Appeal, Third Appellate District.  The appellate court affirmed his convictions with a reasoned opinion on December 31, 2008.  The California Supreme Court denied his petition for review of the appellate court's decision without comment on March 18, 2009.  After exhausting the appellate process, Petitioner filed this federal petition for writ of habeas corpus on May 21, 2009.  On February 16, 2010, Petitioner was ordered to show cause why his petition should not be dismissed for failure to exhaust his remedies in state court.  On March 11, 2010, Petitioner filed an amended petition for writ of habeas corpus.  Respondent filed an answer on September 14, 2010, and Petitioner filed his traverse on November 23, 2010.

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Although "AEDPA does not require a federal habeas court to adopt any one methodology," there are certain principles which guide its application. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim de novo. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that

7

law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause, a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not contain "a formulary statement" of federal law, but the fair import of its conclusion must be consistent with federal law.  *Id.*

Under the "unreasonable application" clause, the court may grant relief "if the state court correctly identifies the governing legal principle...but unreasonably applies it to the facts of the particular case."  *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established federal law is *objectively* unreasonable."  *Bell*, 535 U.S. at 694 (emphasis added).

Finally, the petitioner bears the burden of demonstrating that the state court's decision was either contrary to or an unreasonable application of federal law.  *Woodford*, 537 U.S. at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

# V.  DISCUSSION

## A.    EVIDENCE OF GANG MEMBERSHIP

Petitioner claims that the trial court abused its discretion at both his first and third trials by allowing the prosecution to present evidence that he was a member of a street gang, thus

violating his right to due process of law.  The California Court of Appeal, Third Appellate District,

considered and rejected Petitioner's claim on direct appeal, explaining its reasoning as follows:

> Defendant contends the trial court abused its discretion in admitting evidence that he and McDaniel were members of the Crip[s] street gang.  He contends the evidence was only marginally relevant and extremely prejudicial.  He asserts its admission denied him due process and a fair trial.
>
> Before the first trial, defendant moved to exclude evidence that he was involved or associated with any street gang.  The evidence that defendant was a Crip came from his statement to Detective Gardiman.  In the first trial, the court ruled the evidence was admissible and Detective Gardiman testified defendant told him that both he and McDaniel were Crips.
>
> Before the third trial, defendant again moved to exclude the evidence of his gang membership, arguing there were no allegations the crimes were gang related.  Although the evidence had been admitted in the earlier trials, the defense argued it was unnecessary this time because the People had other evidence tying defendant and McDaniel together.  The prosecutor argued the evidence was reliable because it was defendant's own statement and it was probative on the issue of motive, explaining why defendant went outside the club that night.  The court ruled the evidence was admissible because "the jurors are entitled to understand the full nature of the association between the defendant and Marcus McDaniel."  Acknowledging there was some prejudice, the court found it did not substantially outweigh the probative value of the evidence to show motive.
>
> In closing argument the prosecutor argued defendant's motive was that he and McDaniel were Crips.  "They truly had a special relationship.  The motive in this case is revenge and a gun."  The prosecutor argued defendant was a lone avenging soldier.
>
> "[A]s [a] general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. [Citation.] Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. [Citations.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.)
>
> "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" (*People v. Olguin*

9

(1994) 31 Cal.App.4th 1355, 1369.)  "When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption.  Unless these dangers 'substantially outweigh' probative value, the objection must be overruled."  (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

In arguing the trial court abused its discretion, defendant relies on cases where the court found an abuse of discretion to admit evidence of gang membership to show the bias of a defense witness in favor of defendant.  Thus, in *People v. Cardenas* (1982) 31 Cal.3d 897, it was an abuse of discretion to admit evidence a defense witness and defendant belonged to the same gang.  "The probative value of the gang membership evidence was minimal at best.  The evidence was offered to establish possible bias of the defense witnesses in favor of appellant.  The prosecution sought to prove that the witnesses and appellant 'live[d] in the same neighborhood' and 'had the same circle of friends.'  However, these facts had already been amply established by other testimony before the prosecutor began his inquiries into the witnesses' gang affiliations."  (*Id.* at p. 904.)

Here, the prosecution offered the evidence of common gang membership of defendant and McDaniel not to show bias, as in *Cardenas*, but to show motive based on the nature of the relationship.  "The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.'  (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518, 28 Cal.Rptr.2d 758.) '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.'  (*People v. Lopez* (1969) 1 Cal.App.3d 78, 85 [85 Cal.Rptr.386]; see also *People v. Martin* (1994) 23 Cal.App.4th 76, 81 [28 Cal.Rptr.2d 660] [gang activity or membership admissible where 'important to the motive . . . even if prejudicial'].)"  (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

The evidence indicated the shooting began with a challenge to Smith and his response of getting a gun.  Gaines told Smith he did not belong there and there was bad blood between the two due to an earlier homicide.  The prosecution theory was that defendant became involved only after his friend and fellow Crip McDaniel was shot and injured.  Defendant came to McDaniel's aid when he returned to the club, and then went out and sought revenge on Jackson and Franklin.

The trial court did not abuse its discretion in finding the probative value of the gang evidence as to motive was not substantially outweighed by its prejudicial effect. (Evid. Code, § 352.)  The gang evidence was limited to membership.  Unlike in *People v. Maestas*

(1993) 20 Cal.App.4th 1482, 1499, there was no general testimony about gangs, violence, fear, and retribution.  Further, defendant's argument that the gang evidence was unfairly prejudicial is weakened by the fact that the evidence was introduced in all three trials and argued by the prosecution, but the first two trials resulted in a hung jury on the attempted murder charges.

(Lodged Doc. 4 at 7-10).

To the extent that Petitioner contends that gang evidence should have been excluded pursuant to California state evidentiary law, his claim fails because habeas corpus will not lie to correct errors in the interpretation or application of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

With respect to Petitioner's due process claim, the United States Supreme Court has held that habeas corpus relief should be granted where constitutional errors have rendered a trial fundamentally unfair.  *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  No Supreme Court precedent has made clear, however, that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief.  *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009)  ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  (citation omitted)).

Even assuming that improper admission of evidence under some circumstances rises to the level of a due process violation warranting habeas corpus relief under AEDPA, this is not such a case.  Petitioner's claim would fail even under Ninth Circuit precedent, pursuant to which an evidentiary ruling renders a trial so fundamentally unfair as to violate due process only if "there are *no* permissible inferences the jury may draw from the evidence."  *Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir 1998) (emphasis in original) (quoting *Jammal v. Van de Kamp*, 926 F.2d 918,

11

920 (9th Cir. 1991)).  *See also Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas

petitioner bears a heavy burden in showing a due process violation based on an evidentiary

decision.").  For the reasons discussed by the state appellate court, there are permissible inferences

the jury could have drawn from the gang evidence admitted at trial, for example to explain

Petitioner's motive for committing the shooting.  Petitioner's trial was not rendered fundamentally

unfair in violation of due process based on admission of the gang evidence.

Petitioner is not entitled to federal habeas corpus relief on this claim.

## B.   LIMITATION OF CROSS-EXAMINATION OF WITNESS RONNIE FRANKLIN AT THE THIRD TRIAL

Petitioner claims that the trial court abused its discretion by limiting at the third trial

his cross-examination of Ronnie Franklin, one of the alleged victims in this case, thus improperly

excluding evidence bearing on Franklin's credibility and denying Petitioner his due process rights

to effectively confront and cross-examine his accuser.  The California Court of Appeal, Third

Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining its

reasoning as follows:

> Franklin was a key prosecution witness as he provided the sole
> evidence that defendant attempted to kill him.  There was no other
> witness or corroborating evidence.  The defense stressed Franklin
> provided the only evidence on count two and argued he was not
> credible because he had lied before.  In an attempt to impeach
> Franklin, the defense sought to question Franklin about his
> involvement in another homicide.  Franklin had been involved in a
> drug deal that resulted in the shooting death of Raymon Lacy (the
> Swank incident).  The prosecution asked the court to determine the
> scope and relevancy of evidence of this incident before it was
> admitted. The defense wanted to question Franklin about the incident
> to show his lack of truthfulness and cooperation with police, his open
> defiance of police investigation, as well as his use of guns.
> Specifically, the defense wanted to question Franklin as to 33
> statements he made in the preliminary hearing of that case and four
> items in the sheriff's report.
>
> The trial court ruled the defense could not cross-examine Franklin on
> most of the enumerated issues.  The court excluded the questioning
> under Evidence Code section 352, finding questioning about another

case would consume too much time and confuse the issues.  The court did not want a minitrial on the other homicide.

Defendant contends the trial court abused its discretion and deprived him of due process by restricting cross-examination of Franklin as to the incident where Lacy was killed.  He contends he should have been allowed to cross-examine Franklin fully about his participation in that incident, his changing stories, his refusal to cooperate until given immunity, and his telling police what they wanted to hear even if not true.

"'[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" [Citations.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 946.)

The Attorney General contends cross-examination was adequate and characterizes defendant's complaint as not being allowed "to beat a dead horse."  Defendant contends jurors would have received a different impression of Franklin's credibility if defendant had been allowed to pursue fully the Swank incident.  We find the cross-examination was adequate.  The defense was able to show that Franklin had lied to the police in the Swank incident, thus raising questions about his credibility.

From the beginning, Franklin appeared less than a cooperative witness.  He refused to provide the usual personal information and appeared in court only because he was under a subpoena.  He had failed to appear previously because he did not want to be involved.  After he saw defendant at Gaines's [sic] funeral and made a certain identification, he did not contact the police.  In fact, he tried to avoid Detective Gardiman.

The defense was able to raise significant questions about Franklin's credibility during cross-examination.  Franklin was cross-examined extensively about his selection of McDaniel's photograph in the first

13

lineup and inconsistencies between his trial testimony and that at the preliminary hearing. The defense was able to show his lack of truthfulness and cooperation with the police, particularly with respect to the Swank incident. Franklin admitted he had bad experiences with the police and did not always tell them the truth. He admitted he lied to the police. In February 2006, the time of the Swank incident, he demanded immunity before he spoke to the police. Despite the grant of immunity, he repeatedly lied to them. Franklin did not want to testify at the trial and he did not trust the police. Under defense questioning, Franklin admitted he could not possess a weapon because he was a felon. When he first spoke to the police about the Swank incident, he lied; he just went along with what the police said. Franklin never clarified his lies.

The trial court did not abuse its discretion in limiting cross-examination of Franklin. Defendant has not shown that additional questioning about the Swank incident would have produced a significantly different impression of Franklin.

(Lodged Doc. 4 at 10-14).

As noted above, absent some federal constitutional violation, a violation of state evidentiary law does not ordinarily provide a basis for federal habeas corpus relief. *Estelle v. McGuire*, 502 U.S. at 67-68. Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas corpus relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 794, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

The right to confront witnesses, guaranteed by the Sixth and Fourteenth Amendments, includes the right to cross-examine adverse witnesses to attack their general credibility or show their possible bias or self-interest in testifying. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *Davis v. Alaska*, 415 U.S. 308, 316 (1973); *United States v. Larson*, 460 F.3d 1200, 1206 (9th Cir. 2006). A Confrontation Clause violation occurs where the defendant is prevented from investigating "a prototypical form of bias" if "[a] reasonable jury might have received a significantly different impression of [the witness']

14

credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680.  However, "[t]rial judges retain wide latitude insofar at the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable," *id.* at 679, and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Michigan v. Lucas*, 500 U.S. 145, 150 (1991).  Thus, the Confrontation Clause does not prevent a trial judge from imposing "reasonable limits" on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.  "The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

The denial of a defendant's opportunity to impeach a witness is subject to harmless error analysis. *Van Arsdall*, 475 U.S. at 684; *Bockting v. Bayer*, 399 F.3d 1010, 1020 (9th Cir. 2005) ("Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial.").  Accordingly, Petitioner is not entitled to relief on his confrontation clause claim unless he can establish that the trial court's error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  *See also Forn v. Hornung*, 343 F.3d 990, 999 (9th Cir. 2003) (finding that a Confrontation Clause error did not have a "substantial and injurious" effect on the verdict and that the error was therefore harmless.).  In determining whether the alleged error was harmless, the court considers a variety of factors, including: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of the cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.  *See Van Arsdall*, 475 U.S. at 684.

15

Petitioner has failed to demonstrate that the decision of the California Court of Appeal was contrary to or an unreasonable application of clearly established federal law. Here, defense counsel wished to cross-examine Franklin regarding thirty-three statements made during the preliminary hearing, as well as four items in the sheriff's report, explaining that he intended to impeach Franklin's credibility with the proposed line of questioning. Much of the proffered cross-examination was excluded under section 352 of the California Evidence Code, a well-established state rule which permits a court to exercise its discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of under prejudice, of confusing the issues, or of misleading the jury." The trial court explained as follows regarding its decision to exclude portions of the proposed cross-examination:

> Pursuant to 352 and as to all of these, let me just say, you know, that there's varying degrees of relevance here, but it's my judgment that each of these issues, whatever relevance is either very attenuated or substantially outweigh[ed by] the possibility of confusing the issues, confusing the jury and consuming an undue amount of time and I really don't want to. I don't want to get into a minitrial on the incident of February 6th, 2006, and I think counsel has plenty of ammunition even without the things I'm allowing . . . .
>
> . . . .
>
> Consumption of time is an issue; but, you know, I don't think it's the major issue in my ruling here. I really haven't considered more of [sic] the fact that getting too much into the incident of February of this year confuses the issues to the jury and I want to stick to our trial, I don't want to try someone else's trial.

RT3 at 380-82.[1]

No clearly established federal precedent requires admission of questionably relevant

---

[1] As there were three separate trials in this case, three sets of Reporter's Transcripts have been lodged with the court. For the sake of clarification, RT1 will refer to the Reporter's Transcripts of the first trial, RT2 to the transcripts of the second trial, and RT3 to the transcripts of the third trial. Only one set of Clerk's Transcripts have been lodged, and that set is relevant to all three trials.

16

evidence or evidence with relevance substantially outweighed by consumption of time or the danger

of confusing the jury.  Rather, as already set forth, trial courts may impose "reasonable limits" on

cross-examination based on, inter alia, concerns about relevance or confusing the jury.  *Van Arsdall*,

475 U.S. at 679.  Petitioner has not demonstrated that the limits on cross-examination set by the trial

judge and described in the opinion of the state appellate court regarding the Swank incident were

unreasonable.

Moreover, the state appellate court's evaluation, as quoted above, of Franklin's

testimony on cross-examination is fully supported by the record.  Indeed, his testimony reflected that

he was uncooperative, did not want to be involved with the trial, was untruthful to police, failed to

respond to a previous subpoena for testimony, possessed a firearm as a felon, and made numerous

inconsistent statements.  On this record, Petitioner has not demonstrated that the trial court's

evidentiary ruling had "a substantial or injurious effect or influence" on the jury's verdict in that the

jury would have had a significantly different impression of Franklin's credibility had the trial court

permitted the additional proposed questioning.  *Brecht*, 507 U.S. at 619.  Petitioner's jury was

advised of sufficient information to enable it to effectively assess Franklin's credibility issues and

to "appropriately draw inferences relating to the reliability of the witness."  *Van Arsdall*, 475 U.S.

at 680.

Petitioner is not entitled to federal habeas corpus relief on this claim.

## C.   SUFFICIENCY OF THE EVIDENCE IN SUPPORT OF PETITIONER'S CONVICTION FOR ATTEMPTING TO MURDER FRANKLIN

Petitioner claims that the evidence presented at trial was insufficient to support his

conviction for attempting to kill Ronnie Franklin.  The California Court of Appeal, Third Appellate

District, described Petitioner's claim and rejected it on direct appeal, explaining as follows:

> Defendant contends there is insufficient evidence he attempted to kill
> Franklin.  He contends there is insufficient evidence he had the
> specific intent to kill because the gun was empty when he pointed it
> at Franklin and he knew it was out of bullets because the gun had

clicked and not fired the second time he tried to shoot Jackson. Defendant contends firing a gun one knows is empty is at most brandishing, not attempted murder.

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the killing.  (Pen. Code, § 21a; *People v. Lee* (2003) 31 Cal.4th 613, 623.)  That the gun did not fire does not preclude a conviction for attempted murder.  (See *People v. Buskirk* (1952) 113 Cal.App.2d 789, 793 [attempted murder conviction where gun failed to fire due to defective recocking mechanism].)

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 741.)   The jury could infer from defendant's actions in shooting at Franklin at close range that defendant intended to kill him.

Defendant's argument is premised on the assertion that the evidence established that he knew the gun was empty when he pulled the trigger.  The gun did not fire when defendant pointed it at Franklin; Franklin heard the gun click.  Jackson had also heard the gun click the second time defendant tried to shoot him.  The firearms expert testified an empty gun would click.

Defendant's premise, however, is pure speculation.  There was no evidence that a click necessarily meant the gun was empty or that defendant knew the click meant the gun was out of ammunition or that he even heard it.  No guns were recovered, so there was no evidence the gun defendant fired was actually out of ammunition; it may have jammed or otherwise failed to operate.  Defendant bases his argument that the gun was empty on the number of bullets known to be fired.  But the firearms expert could not say these bullets were all fired from the same gun.  There was no evidence establishing the number of guns present that night.

The circumstances of defendant's attempt on Franklin's life, especially his actions in pointing a gun directly at Franklin at a fairly close range and pulling the trigger, provided sufficient evidence of an intent to kill for attempted murder.  (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

18

1   (Lodged Doc. 4 at 14-16).

2          The Due Process Clause of the Fourteenth Amendment "protects the accused against

3   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

4   crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "A petitioner for a

5   federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence

6   used to obtain a state conviction on federal due process grounds." *Juan H.V. Allen*, 408 F.3d 1262,

7   1274 (9th Cir. 2005). The United States Supreme Court has  established a two-step inquiry for

8   considering a challenge to a conviction based on the sufficiency of the evidence. *Jackson v.*

9   *Virginia*, 443 U.S. 307 (1979). *See also U.S. v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010). First,

10  the court considers the evidence at trial in the light most favorable to the prosecution. *Jackson*, 443

11  U.S. at 319. The prosecution is not required to "rule out every hypothesis except that of guilt," and

12  the reviewing court, "when faced with a record of historical facts that supports conflicting

13  inferences, must presume – even if it does not affirmatively appear in the record – that the trier of

14  fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

15  *Wright v. West*, 505 U.S. 277, 296-97 (1992) (internal citations omitted). *See also Nevils*, 598 F.3d

16  at 1164. Indeed, it is the province of the jury to "resolve conflicts in testimony, to weigh evidence,

17  and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. *See*

18  *also Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility

19  of witnesses is generally beyond the scope of review."); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th

20  Cir. 2004) ("A jury's credibility determinations are therefore entitled to near-total deference under

21  *Jackson*."). Thus, a reviewing court "may not usurp the role of the finder of fact by considering how

22  it would have resolved the conflicts, made the inferences, or considered the evidence at trial."

23  *Nevils*, 598 U.S. at 1164 (citing *Jackson*, 443 U.S. at 318-319).

24          Second, after viewing the evidence in the light most favorable to the prosecution, the

25  reviewing court must determine "whether the record evidence could reasonably support a finding

26                                         19

of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318.  "At this second step, however, a reviewing court may not ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt, only whether *any* rational trier of fact could have made that finding." *Nevils*, 598 F.3d at 1164 (internal quotations omitted) (emphasis in original).  The second step requires reversal of the verdict "if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." *Id*.  This standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 319).

In Petitioner's case, the jury was instructed at trial regarding the crime of attempted murder, pursuant to relevant sections of the California Penal Code, as follows:

> The Defendant is accused in Counts One and Two of having committed the crime of attempted murder, in violation of sections 664 and 187 of the [California] Penal Code.
>
> Every person who attempts to murder another human being is guilty of a violation of Penal Code sections 664 and 187.
>
> Murder is the unlawful killing of a human being done with malice aforethought.
>
> In order to prove attempted murder, each of the following elements must be proved:
>
> 1.  A direct but ineffectual act was done by one person towards killing another human being; and
>
> 2.  The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.
>
> In deciding whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other.  Mere preparation, which may consist of planning the killing or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt.  However, acts of a person who intends to kill another person will constitute attempt where those acts clearly

20

indicate a certain unambiguous intent to kill.  The acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design.

It is also alleged in Counts One and Two that the crime attempted was willful, deliberate, and premeditated murder.  If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not.

"Willful" means intentional.  "Deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of consideration for and against the proposed course of action.  "Premeditated" means considering beforehand.

If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is attempt to commit willful, deliberate, and premeditated murder.

The law does not undertake to measure in units of time the length of period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.  The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation.

To constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being.

The People have the burden of proving the truth of this allegation.  If you have a reasonable doubt that it is true, you must find it to be not true.

You will include a special finding on that question in your verdict, using a form that will be supplied for that purpose.

A person, who has once committed acts which constitute an attempt to commit a crime, is liable for the crime of Attempted Willful

21

Murder even though he does not proceed further with the intent to commit the crime, either by reason of voluntarily abandoning his purpose or because he was prevented or interfered with in completing the crime.

CT at 248-250.

Accepting the state appellate court's interpretation and application regarding the elements of the offense, as this court is required to do, the record evidence reasonably supports a finding that Petitioner was guilty of attempting to murder Franklin. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Viewing the evidence in the light most favorable to the prosecution, and for the reasons described by the California Court of Appeal, there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of the attempted murder of Franklin. That Petitioner can construct from the evidence alternative scenarios which he contends are at odds with the verdict does not mean that the evidence was insufficient to support his conviction for attempted murder. The state court opinion rejecting Petitioner's argument is a reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of clearly established federal law. *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002); 28 U.S.C. § 2254(d)(1).

Petitioner is not entitled to federal habeas corpus relief on this claim.

**D.    JURY'S USE OF A MAGNIFYING GLASS**

Petitioner claims that he was denied his right to a fair trial by the trial court's decision to permit the jury during deliberations to use a magnifying glass to view photographs admitted into evidence at trial, coupled with the trial court's refusal to reopen the trial in order to allow him to present a defense to any new material which may have been noticed by jurors as a result of their use of a magnifying glass. According to Petitioner, the use of a magnifying glass "might produce

22

essentially new evidence in the form of a previously unseen image detail or some characteristic of some item in a photograph and the presentation of such information to a jury is something that [he had] a right to know about and to explain or rebut." Pet. at Ex. H.

During deliberations, the jury sent a note requesting the use of a magnifying glass to examine photographs admitted into evidence at trial. Following oral argument by both parties, the trial court determined that, under California law, use of a magnifying glass was only an extension of the jury's sense of sight and was not equivalent to conducting independent investigation or considering evidence outside of the record, explaining as follows:

> Well, I'm going to permit the use of a magnifying glass. Turner is controlling. I don't think they're going outside the exhibits and not going beyond the nature of the evidence that was presented at trial. They were asked to examine the photographs and the videotape and other evidence very closely and clearly. That's what they're doing.
>
> I think that Castro is easily distinguishable. That is a case that involved one of the jurors re -- recreating -- use of binoculars to see if somebody really could see what the officer said he could see.
>
> I think Compion is interesting, also. That case is -- and the Court comments in Compion that it's not the use of the exhibit which created misconduct but its use in some manner outside the offered evidence. I don't think they are. They aren't mis-using that [evidence] different [sic] from the way it was used in the trial. They looked at them very closely. They're just asking to use it with magnifying glasses, and I do think it's an extension of their power of sight and they're able to see something that we haven't.

RT3 at 1881-1882. Following the trial court's ruling, defense counsel moved to reopen the trial in order to present evidence regarding magnification and the use of a magnifying glass. However, defense counsel could not identify with any specificity what type of evidence he would like to present. The trial court denied the motion to reopen, without prejudice, noting that if the defense wanted to "develop something," it should be presented as soon as possible. RT3 at 1883. It does not appear from the record that the court ever revisited the magnification issue prior to the jury's verdict.

23

The California Court of Appeal, Third Appellate District, considered and rejected

Petitioner's magnifying glass claim on direct appeal, explaining its reasoning as follows:

> Defendant contends the trial court erred in permitting the jury to use a magnifying glass, arguing he was denied the right to present a defense to all evidence presented against him. Defendant further contends the court erred in refusing to allow the defense to reopen the case to present a defense as to any new material that might be noticed with a magnifying glass.

> During deliberations the jury asked if it could use a magnifying glass. The defense objected, stressing there had been no defense or cross-examination as to use of a magnifying glass. The prosecutor noted the photographs from the surveillance tape had been magnified three or four times their original size by use of an overhead machine known as an Elmo and the defense had an opportunity to respond to that.

> The trial court ruled the use of a magnifying glass was permissible, relying on *People v. Turner* (1971) 22 Cal.App.3d 174. The defense then requested reopening the case to present evidence regarding magnification, but it could not specify what such evidence it would present. The court permitted the jury to use a hand held magnifying glass that magnified images three and [a] half times. It denied the request to reopen without prejudice. If the defense wanted to develop something, they were to present it as soon as possible.

> "It is a fundamental rule that all evidence shall be taken in court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of such exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted manner. They may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party to meet, answer, or explain." (*Higgins v. L.A. Gas & Electric Co.* (1911) 159 Cal. 651, 656-657.)

> Use of a magnifying glass to scrutinize photographic exhibits is not classified as an experiment introducing new evidence into the trial. In *People v. Turner, supra,* 22 Cal.App.3d 174, the jurors used a magnifying glass to scrutinize a photograph of the defendant taken from a video at the market where she purportedly negotiated a forged

24

check.  By using the glass, the jurors could discern the lines on defendant's outstretched hands in the picture and compare them to defendant's when she stood before the jury in the same position.  (*Id.* at p. 179.)  The appellate court refused to classify the jury's use of the magnifying glass as an experiment because it introduced no new evidence.  Because this photograph had been introduced at trial, use of the magnifying glass only allowed "'a more critical examination'" of the evidence already offered at trial.  (*Id.* at p. 183.)  "At most, the use of the magnifying glass involved an extension of the jury's sense of sight [citation.]" (*Ibid.*)

Defendant objects that he was not allowed to present evidence to defend against his use of magnification.  Defendant's motion to reopen was denied without prejudice; the court would reconsider if defendant could articulate what evidence he wished to offer.  Both below and on appeal, defendant has failed to identify what evidence he sought to introduce.  Nor has he shown how the magnification by means of the magnifying glass differed in any significant way from the magnification presented to the jury by the use of the Elmo machine.

The trial court did not err in permitting the jury to use a magnifying glass or in denying defendant's motion to reopen the case for additional evidence.

(Lodged Doc. 4 at 16-18).

Under the Sixth Amendment, a criminal defendant has the right to be tried by an impartial jury and to confront and cross-examine the witnesses who testify against him.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  The defendant is also entitled to a jury that reaches a verdict on the basis of evidence produced at trial.  *Turner v. Louisiana*, 379 U.S. 466 (1965); *Estrada v. Scribner*, 512, F.3d 1227, 1238 (9th Cir. 2008); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court.").  The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction.  *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966).

In this case, the decision of the state appellate court is not contrary to or an unreasonable application of clearly established federal law.  There is no evidence that any

extraneous information was received by Petitioner's jury, and no clearly established federal law prohibits use of a magnifying glass by jurors to more closely examine during jury deliberations photographs properly admitted into evidence at trial.  Indeed, the Ninth Circuit Court of Appeals has refused to characterize the use of a magnifying glass by a jury as extrinsic or new evidence, explaining "We are unable to see how the use of [a] magnifying glass to view photographs differs from the use of corrective eyeglasses by jurors."   *United States v. Brewer*, 783 F.2d 841, 843 (1986).  *See also United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995) ("No 'new evidence' resulted from the jurors' use of a magnifying glass to examine the fingerprint cards and gun.") (citing *Brewer*, 783 F.2d 841, 843 (holding use of a magnifying glass indistinguishable from a juror's use of corrective eyeglasses to examine evidence); *United States v. Miranda,* 986 F.2d 1283, 1286 (9th Cir. 1993) (noting that a defendant alleging juror misconduct involving a magnifying glass conceded, "as he must," that a magnifying glass is not extrinsic evidence).  Thus, whether the jury examined properly admitted evidence "with their naked eyes, through spectacles, or through a magnifying glass is immaterial.  What they saw was not extrinsic evidence."  *United States v. Gomez-Gomez*, 24 F.3d 250 (9th Cir. 1994) (unpublished).

Petitioner is not entitled to federal habeas corpus relief on this claim.

**E.      REFUSAL TO ALLOW THE JURY TO VIEW THE CRIME SCENE**

Petitioner claims that the trial court's refusal to allow the jury to view the scene where the shootings took place was an abuse of discretion which denied him his rights to a fair trial and to due process of law.  The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining its reasoning as follows:

> Defendant contends the trial court abused its discretion in denying the defense request that the jury view the crime scene.  Defendant contends the jury view "in a case like this would be extremely useful in showing the improbability of certain victim claims and the relative positions of the various places involved."  We find the court acted well within its discretion in denying the viewing.

After Franklin testified, the jury submitted a number of questions to the court. One question asked for measurements of the building, the walkway and the parking lot. The prosecutor indicated his witness the next day would provide measurements. The defense attorney requested a jury view of the crime scene. The prosecutor argued a jury view was unnecessary, given the large number of photographs in the case. The defense reminded the court that it had allowed a jury view in the second trial, and argued an actual viewing was better than a two-dimensional picture.

The court denied the request because the scene could be recreated through photographs. The court also noted there had been remodeling changes since the crime. Recognizing its ruling differed from its previous ruling, the court concluded it had made a mistake in permitting the view in the prior trial.

Penal Code section 1119 permits a court to determine that "it is proper that the jury should view the place in which the offense is charged to have been committed." A trial court's decision whether to permit a jury view is reviewed for an abuse of discretion. (*People v. Price* (1991) 1 Cal.4th 324, 421.) "When the purpose of the view is to test the veracity of a witness's [sic] testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view. [Citations.]" (*Id.* at p. 422.) "The fact that physical conditions upon or about the premises may have been to any degree altered is a fact to be considered by the trial court in exercising its discretion to permit or refuse to permit such view and its conclusion in that regard will not be disturbed upon appeal in the absence of a clear showing of an abuse of such discretion." (*People v. Pompa* (1923) 192 Cal. 412, 421.)

Defendant has failed to show an abuse of discretion. Although on appeal he argues the view would be useful to assess the witnesses' veracity, below he argued only that the view would be helpful to answer the jury's questions about measurements and that the court had permitted it before. The jury was provided with ample evidence to assess the scene of the crime. In addition to the numerous photographs of the scene presented to the jury, a prosecution investigator made a video reenactment of the crime, showing clearly the locations outside Donald's Place. In addition, the investigator provided the measurements between various locations at the scene. This evidence also provided sufficient means to test the witnesses' veracity as to what happened there.

(Lodged Doc. 4 at 18-20).

27

Once again, evidentiary rulings by a state trial court are typically questions of state law which are not cognizable in federal habeas corpus proceedings. *Estelle*, 502 U.S. at 68. Petitioner has not cited, and the court is not aware of, any clearly established federal law providing a criminal defendant the right to a jury view of a crime scene.

Criminal defendants, however, have a due process right, implicit in the Sixth Amendment, to present a defense. *Washington v. Texas*, 388 U.S. 14, 19 (1967). *See also Crane v. Kentucky*, 476 U.S. 683, 690 (1986). That right is not unlimited. *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002). A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane*, 476 U.S. at 689-91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"). To be unconstitutional, an evidentiary exclusion must have "significantly undermined fundamental elements of the accused's defense." *Scheffer*, 523 U.S. at 315. In other words, in order to prevail, Petitioner must show that the state court's ruling was so prejudicial that it rendered his trial fundamentally unfair. *See Estelle*, 502 U.S. at 68. In addition, even if a trial court's exclusion of evidence amounted to a constitutional violation, habeas corpus relief is warranted only if the violation actually had a "substantial and injurious effect" upon the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993). *See also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (requiring *Brecht* review regardless of whether the state court recognized the error and reviewed it for harmlessness).

In this case, the trial court concluded that permitting the jury to visit the location of Petitioner's alleged crimes was unnecessary under state law, explaining as follows:

> I think the trial judge in the last trial erred when he granted the jury view. I do think I've learned a little bit about jury views and the law relating to them since the time of the last -- since the jury view in trial

No. 2.  The fact that we can recreate or represent how the scene looked is, in fact, a legal argument why we don't need a jury view. The fact that there are photographs, the fact that there have been some remodeling changes, although that alone wouldn't prevent the jury view, but there have been some changes, the building has been reoriented with the front doors now being on the south side instead of the west side, but there are photographs that accurately depict the way the scene looked at the time of the incident.  There are early photographs which give an overall orientation as to the way the building is lined up, and these distances can be measured.  There is no reason that we need a jury view to answer any of these questions, so I don't see a need for it.  I don't see that it would contribute materially to the jury's understanding of what the scene looked like. I'm disinclined to grant it.

RT3 at 633-634.

Petitioner has failed to demonstrate that the trial court's refusal to grant him a jury view of the crime scene significantly undermined fundamental elements of his defense or that it was so prejudicial that it rendered his trial fundamentally unfair.  State lawmakers have broad latitude under the Constitution to establish evidentiary rules for criminal trials.  *See Holmes v. South Carolina*, 547 U.S. 319, 324  (2006).  Here, California state law provides the trial court with the discretion to determine whether "the jury should view the place in which the offense is charged to have been committed" in any particular case.  CAL. PENAL CODE § 1119.  Accordingly, the trial court ruled that a jury view was unnecessary because ample evidence was to be presented at trial which would  recreate the crime scene for the jury, thus a jury view was not likely to materially enhance the jury's understanding of the crime scene.  Moreover, the court noted that, although potentially only of minor importance, the premises upon which the shooting had taken place had since been modified such that they no longer accurately represented the crime scene on the night of the shootings.

Petitioner claims that  "[a] jury view in a case like this would be extremely useful in showing the improbability of certain victim claims and the relative positions of the various places involved."  Pet. at Ex. I.  He further argues that Franklin's testimony conflicted, at least in part, with

29

1  other evidence and that a jury view would have allowed the jury to more accurately assess Franklin's

2  credibility.  Petitioner's argument, however, ends there.  He does not direct the court to a single

3  specific piece of evidence with which Franklin's testimony conflicted, nor does he explain how a

4  jury view of the crime scene would have assisted the jury in determining Franklin's veracity as a

5  trial witness.  Indeed, it is clear from the trial transcripts that Franklin was subjected to a vigorous

6  cross-examination by Petitioner's trial counsel, and Petitioner does not now allege that counsel

7  failed to highlight any inconsistencies between Franklin's testimony and the evidence.  Moreover,

8  review of the record reveals that, as the state appellate court summarized, significant evidence was,

9  in fact, presented to the jury regarding the crime scene.  In addition to witness testimony, this

10  evidence consisted of a video re-enactment of the shootings; numerous photographs, including aerial

11  photographs; charts; diagrams; and numeric measurements.  Petitioner does not explain how this

12  evidence combined with Franklin's cross-examination failed to accurately depict the crime scene

13  in a way only a jury view could or failed to bring to the jury's attention any inconsistencies between

14  Franklin's testimony and crime scene.  Accordingly, he has not demonstrated that the trial court's

15  ruling had a substantial and injurious effect on the jury's verdict.

16         The decision of the state appellate court upholding the decision of the trial court to

17  deny the requested jury view is not contrary to or an unreasonable application of clearly established

18  federal law.  Petitioner is not entitled to habeas corpus relief on this claim.

19                                    **VI.  CONCLUSION**

20         IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be

21  denied.  These findings and recommendations are submitted to the United States District Judge

22  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days

23  after being served with these findings and recommendations, any party may file written objections

24  with the court and serve a copy on all parties.  Such a document should be captioned "Objections

25  to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served

26                                          30

and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

IT IS SO ORDERED.

DATED: August 17, 2011

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

31